Sealed

Public and unofficial staff access
to this instrument are
prohibited by court order

United States Courts
Southern District of Texas
FILED

December 14, 2022

Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO. 22-cr-624** |
| | § | **SEALED** |
| **UOP, LLC, d/b/a** | § | |
| **HONEYWELL UOP** | § | |
| | § | |

## INFORMATION

THE UNITED STATES CHARGES:

At all relevant times, unless otherwise stated:

I.    The Foreign Corrupt Practices Act

1.    The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1 et seq. (the "FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

II.    The Defendant

2.    The defendant UOP, LLC, doing business as Honeywell UOP ("Honeywell UOP" or the "Company") was a Delaware corporation headquartered in Des Plaines, Illinois.  Honeywell UOP was a global provider of technology to various industries, including petroleum refining, gas processing, and petrochemical production.  Honeywell UOP was a "domestic concern," as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(1).

III.    Relevant Entities and Individuals

3.      Honeywell UOP was a wholly-owned subsidiary of Honeywell International Inc. ("Honeywell"), a multinational technology and manufacturing company headquartered in Charlotte, North Carolina.

4.      Petróleo Brasileiro S.A. – Petrobras ("Petrobras") was a corporation headquartered in Rio de Janeiro, Brazil, that refined, produced and distributed oil, oil products, gas, biofuels, and energy.  Through voting rights, the Brazilian government directly controlled more than 50 percent of Petrobras's common shares, while an additional 10 percent of Petrobras's shares were controlled by the Brazilian Development Bank and Brazil's Sovereign Wealth Fund.  Petrobras was controlled by the Brazilian government and performed government functions.  Petrobras was an "instrumentality" of a foreign government, and Petrobras's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

5.      "Brazil Sales Company," whose identity is known to the United States and the Company, was a Brazil-based company that served as a sales agent for Honeywell UOP in or about and between 2010 and 2014.  Brazil Sales Company was an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

6.      "Honeywell UOP Employee 1," an individual whose identity is known to the United States and the Company, was a United States citizen and resident of Brazil. Honeywell UOP Employee 1 was an account director for Honeywell UOP.  Honeywell UOP Employee 1 was an employee and agent of a domestic concern as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

2

7.      "Petrobras Official 1," an individual whose identity is known to the United States and the Company, was a citizen of Brazil and a high-ranking executive at Petrobras. Petrobras Official 1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

8.      "Intermediary 1,"  an individual whose identity is known to the United States and the Company, was a citizen of Brazil who solicited and collected bribe payments on behalf of Petrobras Official 1 from a number of different companies.

9.      "Intermediary 2," an individual whose identity is known to the United States and the Company, was a Brazilian citizen and the owner of Brazil Sales Company in or about and between 2010 and 2014.  Intermediary 2 was an agent of a domestic concern, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

IV.    The Bribery Scheme

10.     From in or about and between at least 2010 and 2014, Honeywell UOP, through certain of its employees and agents, knowingly and willfully conspired and agreed with others to corruptly offer a bribe to, and for the benefit of, Petrobras Official 1, a foreign official in Brazil, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(2), to secure improper advantages in order to obtain and retain business from Petrobras in connection with Honeywell UOP's efforts to win an approximately $425 million contract from Petrobras to design and build an oil refinery called Premium (the "Premium Refinery Contract").

11.     The bribe was offered with the knowledge, authorization, and at the direction of Honeywell UOP Employee 1.  In furtherance of the scheme, among other things, Honeywell UOP, through Honeywell UOP Employee 1, entered into an agency agreement with

3

Brazil Sales Company for the purpose of funding and paying a bribe of $4 million to Petrobras

Official 1 to win the Premium Refinery Contract.  In exchange for the offer of a $4 million bribe,

and after obtaining business advantages, including inside information and secret assistance, from

Petrobras Official 1, Honeywell UOP won the Premium Refinery Contract.  Honeywell UOP

ultimately earned approximately $106 million in profits from the corruptly obtained business.

       12.     In or about July 2009, Honeywell UOP submitted a technical proposal to

Petrobras in connection with Honeywell UOP's bid to win the Premium Refinery Contract.

       13.     In or about January 2010, Honeywell UOP Employee 1 attended a meeting

in Houston with several Petrobras officials for the purpose of discussing, among other things, the

Premium Refinery project.

       14.     In or about March 2010, Petrobras invited Honeywell UOP to participate

in the design competition phase of the bidding process for the Premium Refinery Contract.  At

the time, Honeywell UOP was competing against two other companies for the contract.

       15.     On or about May 17, 2010, two Honeywell UOP employees provided their

management with a PowerPoint presentation stating that the two other companies bidding on the

Premium Refinery Contract were "STILL a[] threat to us."  Around this time, Honeywell UOP

Employee 1 recommended that Honeywell UOP hire Brazil Sales Company to serve as a sales

agent for Honeywell UOP to help it win the Premium Refinery Contract.

       16.     On or about May 27, 2010, two Honeywell UOP employees submitted a

form requesting that Honeywell's compliance department approve Brazil Sales Company to

serve as Honeywell UOP's sales agent.  To increase the likelihood of receiving internal

approvals, the Honeywell UOP employees lied on the request form, stating that Brazil Sales

Company had been "known to" Honeywell UOP and a Honeywell UOP employee for two years, when, in fact, the companies had no common history and the Honeywell UOP employee had no prior knowledge of Brazil Sales Company.

17.     In or about the summer of 2010, Honeywell UOP Employee 1 met in Brazil with Petrobras Official 1.  During the meeting, Honeywell UOP Employee 1 offered to pay Petrobras Official 1 a percentage of Honeywell UOP's revenue on the Premium Refinery Contract if Petrobras Official 1 would agree to help Honeywell UOP win the contract from Petrobras.

18.     In or about the summer of 2010, Honeywell UOP Employee 1 also met in Brazil with Intermediary 1, a "lobbyist" who collected bribe payments on behalf of Petrobras Official 1 and Intermediary 2.  During the meeting, Honeywell UOP Employee 1 and Intermediary 2 offered to pay Petrobras Official 1 one percent of the expected revenue from the Premium Refinery Contract, or approximately $4 million, in exchange for Petrobras Official 1 using his influence to help Honeywell UOP win the contract.  They agreed to use a portion of Brazil Sales Company's expected three-percent sales commission (approximately $12 million) from Honeywell UOP to pay the $4 million bribe.  They also agreed that the remaining $8 million from the sales commission paid to Brazil Sales Company would be divided equally between the Intermediary 1 and Intermediary 2.

19.     In furtherance of the bribery scheme, Petrobras Official 1 evaluated Honeywell UOP's proposed bid on the Premium Refinery Contract and determined that Honeywell UOP would not win at that price.  Petrobras Official 1 and Intermediary 1 then told Honeywell UOP Employee 1 the maximum amount that Honeywell UOP could bid and still win

5

the contract, given Petrobras's budget, which resulted in (1) Honeywell UOP wining the contract; (2) Honeywell UOP receiving the largest possible profit; and (3) Petrobras Official 1 receiving the largest possible bribe, given that Brazil Sales Company's sales commission, which was to fund the "one-percent" bribe payment, was based on the contract's overall revenue.

20.     In internal correspondence, certain Honeywell UOP employees, including Honeywell UOP Employee 1, used the code words "King" to refer to Petrobras Official 1 and "King's Assistant" to refer to Intermediary 1 when discussing the confidential Petrobras information and secret assistance to Honeywell UOP that Petrobras Official 1 was providing in exchange for the $4 million bribe.

21.     For example, on or about July 12, 2010, a Honeywell UOP employee wrote an email to another Honeywell UOP employee, stating "in today's meeting between [Honeywell UOP Employee 1] and King [i.e., Petrobras Official 1], I am wondering if we can get a feeling from King [sic] what is the ballpark and NOT TO EXCEED number" for the bid on the Premium Refinery Contract.

22.     On the next day on or about July 13, 2010, the same Honeywell UOP employee referenced above in Paragraph 21 wrote, "Hope King's assistant [i.e, Intermediary 1] can provide us the number (either with or without tax) this week."

23.     On or about July 21, 2010, Honeywell UOP Employee 1 wrote to two Honeywell UOP employees, "KING [Petrobras Official 1] – yesterday – confirms that budget is 500 . . . [and] [a]dvises that differences greater than 20-25% make it difficult to justify selecting us over others[.]"

24.     On or about August 6, 2010, Honeywell UOP Employee 1 sent an email to two Honeywell UOP employees, "I am proceeding to clarify situation with King [Petrobras Official 1] and receive orientation as to how to proceed."

25.     On or about August 11, 2010, a Honeywell UOP employee sent an email to two Honeywell UOP executives, stating that "King [Petrobras Official 1] has asked for all numbers from PB [i.e., Petrobras] team . . . ."  The Honeywell UOP employee further described in the same email that he would "meet with Assistant [Intermediary 1] tonight to get the numbers and receive clear guideline and [the] target number."

26.     Also on or about August 11, 2010, a Honeywell UOP employee sent an email to another employee, stating that "we should have [Intermediary 2] issues agreed upon internally and I will finalize [by] this afternoon . . . [t]he direct meeting with the King [Petrobras Official 1] is scheduled for breakfast tomorrow . . . ."

27.     Later that day, on or about August 11, 2010, a Honeywell UOP employee sent an email to a number of Honeywell UOP executives and employees, providing Petrobras's confidential internal target number for the winning bid and the amounts of the bids that Honeywell UOP's two competitors had submitted to Petrobras.

28.     The following day, on or about August 12, 2010, a Honeywell UOP employee sent an email to several Honeywell UOP executives that "[Intermediary 2] just signed the agreement [i.e., the Brazil Sales Company Sales Representative Agreement]."  One of the Honeywell UOP executives responded, "[h]opefully this paves the way for a big win. [T]hanks[.]"

7

29.     On or about August 13, 2010, a Honeywell UOP employee sent a calendar invite to a number of  Honeywell UOP executives and employees, setting time for a conference call and noting that "[w]e expect to get an update from King [Petrobras Official 1] regarding his perspective regarding the 'target number' for our revised commercial proposal (370 or 348)."  At the time, Honeywell UOP was debating whether to submit a $370 million bid or a $348 million bid to Petrobras for the Premium Refinery Contract.

30.     Later that day, on or about August 13, 2010, a Honeywell UOP employee wrote an email to another employee, stating that Intermediary 1, who was passing messages from Petrobras Official 1 to Honeywell UOP, had conveyed that "375 would be ok 348 will be more competitive[.]"  Later that day, Honeywell UOP submitted the lower $348 million bid to Petrobras.

31.     On or about August 18, 2010, a Honeywell UOP employee sent an email to Honeywell UOP executives and employees, copying Honeywell UOP Employee 1, and stating, "[m]essage from the King [Petrobras Official 1] was to hold tight and make no further concessions at this point.  He is trying to pull the numbers and decisions up to his level in order to control."

32.     Also on or about August 18, 2010, a Honeywell UOP employee wrote an email to a Honeywell UOP executive, stating "[w]ill you be able to sign the [Brazil Sales Company Sales Representative Agreement] when you get in today?  There was [sic] also some discussions on whether you will sign or delegate to [another Honeywell UOP executive], can you let me know your plans.  I want to get this back to [Intermediary 2] as soon as possible, because

we are pushing for the king [Petrobras Official 1] to step up and intercede." The Honeywell

UOP executive signed the Brazil Sales Company Sales Representation Agreement later that day.

      33.    On or about October 8, 2010, Petrobras notified Honeywell UOP that it

had won the Premium Refinery Contract. Honeywell UOP ultimately earned approximately

$425 million in gross revenue and approximately $106 million in profits from the contract.

      34.    From in or about 2011 to 2014, Honeywell UOP paid approximately

$10.4 million to Brazil Sales Company pursuant to the Brazil Sales Company Sales

Representation Agreement. Honeywell UOP paid those funds to a Swiss bank account in the

name of a different company that was beneficially owned by Intermediary 2. For example, on or

about March 16, 2011, Honeywell UOP transferred from a bank account in the United States

approximately $280,131.54 to a bank account in Switzerland controlled by Intermediary 2.

Additionally, on or about November 14, 2014, Honeywell UOP transferred from a bank account

in the United States approximately $43,726.53 to a bank account in Switzerland controlled by

Intermediary 2.

## <u>COUNT ONE</u>
### (18 U.S.C. § 371 – Conspiracy)

      35.    The allegations set forth in paragraphs one through 34 of this information

are repeated and realleged as if fully set forth herein.

36.     In or about and between 2010 and 2014, both dates being approximate and inclusive, within the Southern District of Texas and elsewhere, the defendant

**HONEYWELL UOP**,

together with others, did knowingly and willfully conspire to commit one or more offenses against the United States, that is, being a domestic concern, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all and a portion of such money and thing of value would and had been be offered, given, and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her and its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her and its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Honeywell UOP and others in obtaining and retaining business for and with, and directing business to, Honeywell UOP and others, contrary to Title 15, United States Code, Section 78dd-2.

## Purpose of the Conspiracy

37.     The purpose of the conspiracy was for the co-conspirators, including the

10

defendant Honeywell UOP, to enrich themselves by, among other things, corruptly offering a bribe to, and for the benefit of, Petrobras Official 1, a foreign official in Brazil, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(2), to secure improper advantages in order to obtain and retain business from Petrobras in connection with Honeywell UOP's efforts to win a lucrative contract from Petrobras.

## Manner and Means of the Conspiracy

38.    The manner and means by which Honeywell UOP and its co-conspirators sought to accomplish the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

39.    Defendant Honeywell UOP, through Honeywell UOP Employee 1, Intermediary 1, and Intermediary 2, discussed in person making bribe payments to Petrobras Official 1 for the purpose of securing an improper advantage and assisting Honeywell UOP in its efforts to secure the Premium Refinery Contract from Petrobras.

40.     Defendant Honeywell UOP, through Honeywell UOP Employee 1, offered to pay, promised to pay, and caused corrupt commission payments to be made by Honeywell UOP to Brazil Sales Company, knowing that such commission payments, or portions thereof, would be used to bribe Petrobras Official 1, for the purpose of securing an improper advantage and assisting Honeywell UOP with obtaining the Premium Refinery Contract from Petrobras.

41.    Defendant Honeywell UOP, through Honeywell UOP Employee 1, Intermediary 1, and Intermediary 2, obtained, disseminated, and discussed confidential information, in its efforts secure the Premium Refinery Contract from Petrobras.

42.     Defendant Honeywell UOP, through Honeywell UOP Employee 1, took steps to conceal the bribery scheme, such as using code words to refer to Petrobras Official 1 and Intermediary 1.

43.     In carrying out the scheme, Honeywell UOP, through Honeywell UOP Employee 1 and Intermediary 2, utilized means and instrumentalities of interstate commerce, including the use of wires.

**Overt Acts**

44.     In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts among others:

45.     In or about January 2010, Honeywell UOP Employee 1 attended a meeting in Houston with several Petrobras officials for the purpose of discussing, among other things, the Premium Refinery project.

46.     On or about July 21, 2010, Honeywell UOP Employee 1 sent an email to two Honeywell UOP employees, "KING [Petrobras Official 1] – yesterday – confirms that budget is 500 . . . [and] [a]dvises that differences greater than 20-25% make it difficult to justify selecting us over others[.]"

47.     On or about August 6, 2010, Honeywell UOP Employee 1 sent an email to two Honeywell UOP employees, "I am proceeding to clarify situation with King [Petrobras Official 1] and receive orientation as to how to proceed."

48.     On or about March 16, 2011, Honeywell UOP transferred from a bank account in the United States approximately $280,131.54 to a bank account in Switzerland

controlled by Intermediary 2.

49.     On or about November 14, 2014, Honeywell UOP transferred from a bank account in the United States approximately $43,726.53 to a bank account in Switzerland controlled by Intermediary 2.

All in violation of Title 18, United States Code, Sections 371.

## FORFEITURE ALLEGATION

50.     As a result of committing the offense alleged in Count One of this Information, Honeywell UOP, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United states Code, Section 2461(c), any and all property, real and personal, which constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

## Substitute Asset Provision

51.     If any of the above-descried forfeitable property, as a result of any act or omission of the defendant:

                a.   cannot be located upon the exercise of due diligence;

                b.   has been transferred or sold to, or deposited with, a third party;

                c.   has been placed beyond the jurisdiction of the court;

                d.   has been substantially diminished in value; or

                e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

Title 18, United States Code, Section 981; Title 21, United States Code, Section 853; Title 28, United States Code, Section 2461.

ALAMDAR S. HAMDANI
United States Attorney
Southern District of Texas

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

BY: _____

SUZANNE ELMILADY
Deputy Chief, Fraud Division

BY: _____

GERALD M. MOODY, JR.
Assistant Chief
GWENDOLYN STAMPER
Trial Attorney

14